

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CV-16-652

|  |  |
|---|---|
| | **Opinion Delivered** March 8, 2017 |
| COMMERCIAL FITNESS CONCEPTS, L.L.C. | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CV-15-1241] |
| APPELLANT | |
| V. | HONORABLE JOHN R. SCOTT, JUDGE |
| WGL, LLC | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |
| APPELLEE | |

## DAVID M. GLOVER, Judge

Commercial Fitness Concepts, LLC (Commercial Fitness), appeals from the April 18, 2016 judgment finding it liable for conversion of property belonging to WGL, LLC (WGL), and awarding WGL $9,682 in damages, plus interest and costs. Commercial Fitness raises three points of appeal, contending: 1) the trial court's finding that WGL proved its conversion claim by a preponderance of the evidence is clearly erroneous; 2) the trial court's finding that WGL proved damages for conversion is clearly erroneous because there was no substantial evidence to establish the fair market value of the modules; and 3) the trial court's award of lost "profits" to WGL should be reversed because of lack of substantial evidence. We affirm the finding of conversion but reverse and remand the awards of damages regarding the module and "lost rents."

This case arose out of Commercial Fitness's purchase of property that was being liquidated in a bankruptcy proceeding. WGL owns a building in Lowell, Arkansas, which

it had leased to Rhett Garner, who operated a World Gym franchise there. Garner filed for bankruptcy, and all of the property owned by him in WGL's building was sold to Commercial Fitness by the bankruptcy trustee. Commercial Fitness entered the premises and removed the property it had purchased from the bankruptcy sale. WGL claimed that Commercial Fitness wrongfully took a computer and related equipment, as well as a module that controlled the HVAC. Consequently, WGL sued for conversion.

At least seven people testified in the bench trial. Bill Clark, the bankruptcy trustee, testified about his duties as a trustee and the procedures he followed in finding a buyer, notifying creditors, and liquidating the equipment at the facility.

Then, Jenelle Kennan, a commercial real-estate agent with Keller Williams Commercial Group, was called by WGL. Before her testimony began, Commercial Fitness objected, contending WGL's purpose in calling her was to offer evidence that there was a potential lessee of the property and her testimony should be excluded because it was hearsay. The trial court responded, "[L]et's wait and find out." In her testimony, Ms. Kennan identified as an exhibit a letter of intent for one of her clients, Rhea Lana, Incorporated. According to Kennan, her client had short-term events four times a year; it looked for large venues where it could resell children's clothing. The date of the letter of intent was June 30, 2015; it was addressed to Tim Salmonsen, who was also a broker at Keller Williams. (Kennan represented Rhea Lana, and Salmonsen represented WGL.) Rhea Lana's interest was in leasing the building for about three weeks, from August 1 through August 21, at a base rent of $3,000 for one of its events. She described the letter of intent as a bona fide offer on behalf of her client, who was prepared to pay $3,000 to rent the premises. Kennan



explained there was an issue regarding the air conditioning of the building and that without the air conditioning, her client could not use the space.

Commercial Fitness renewed its hearsay objection, but the trial court overruled it. Commercial Fitness also asserted a hearsay objection to the introduction of the letter of intent, but it was admitted over the objection. On cross-examination, Ms. Kennan acknowledged that the letter of intent was not a binding agreement but described it as a negotiation tool. She confirmed that the Rhea Lana event ended up being held in Springdale.

Brandon Outlaw, who owned Commercial Fitness, testified as follows. He took possession of the items purchased from the bankruptcy estate during the period from the end of April through the first week in May. He had an average of ten people at a time to help with the removal; he instructed the persons helping him to take "all fitness equipment, all office equipment, phone systems, computers, TVs, all audiovisual equipment, . . . ." He received a phone call or a text message from Mike Charlton, the manager of the facility, after the job was completed. Charlton told him about the HVAC system and identified a desktop computer in the storage room in the tanning area as missing. Outlaw contacted his employees and asked them if a computer was taken out of that room, and they told him it had been. He returned the computer, and he explained a keyboard and monitor were never requested, just the PC. According to Outlaw, Jim Hodges was the person who removed that PC. He asked Hodges if he took anything else out of that room and was told he did not, that all he took was the PC, the monitor, and the keyboard. Outlaw testified he "did not know what the whole HVAC system was a part of until Charlton text[ed] [him] back

and said, 'Well, what about the panel?'" He did not understand what Charlton meant by "the panel," so Charlton sent him a picture. He showed the picture to everybody who worked for him and nobody had seen it. Outlaw's employees went through their entire warehouse to look for the panel, and it was not there. He then told Charlton that he did not have the panel. It was his testimony he wouldn't even know how to remarket an HVAC panel; he sells fitness equipment, not HVAC panels; many people had keys to the facilities; he went through all the equipment several times to make sure he didn't have the panel; and he told the insurance company his people did not remove the panel.

Mike Charlton testified his mother had sole ownership of WGL, and he had been the manager since it was formed. According to him, the building's HVAC system had approximately ten rooftop units and about six units that sat on the north side of the building. A computer operates all of the functions, alarms, warning systems, maintenance, timing, and air restrictions of all sixteen units. The system included a desktop CPU, flat-screen monitor, keyboard, and a device referred to as a "panel" or a "module," which is a control unit. The panel/module was the interface between the computer and the units. It was not possible for the HVAC system to operate without the panel/module or without installing some other type system. The panel/module was located on the north wall above the monitor. The computer, panel/module, keyboard, and monitor all belonged to WGL and were purchased with the original HVAC system. He acknowledged receiving the CPU back from Outlaw, but nothing else. Charlton testified about a text in which Outlaw admitted that his personnel mistakenly took the panel/module.

Charlton presented an August 20, 2015 invoice for $6,597.38 from Northwest Control Systems to pay for the installation of the control panel/module and the software license. Commercial Fitness objected to the exhibit based on hearsay, but the objection was overruled and the invoice was admitted. Commercial Fitness later argued that Arkansas law was clear that replacement cost was not evidence of market value and that an opinion of fair-market value based on replacement cost was improper and insufficient. WGL later introduced the check it wrote to pay the invoice.

Charlton confirmed he listed the building with the Keller Williams Commercial Group to lease or sell it. He explained that he received one offer to lease the building on a temporary basis for $3,000 for a few weeks, and the offer came from Rhea Lana. He stated that prior to receiving the actual letter of intent, which Ms. Kennan testified about, Tim Salmonsen contacted him by phone and read it to him, asking if he was interested. Charlton said he was very interested but told Salmonsen the HVAC was not operational at that time. Commercial Fitness's hearsay objection to this testimony was sustained.

On cross-examination, Charlton stated he would have accepted $3,000 as rent for the building. He also acknowledged he did not know if there was any difference between the modules that were newly installed in 2015 and the ones that were originally installed in 2007, and he did not have any personal knowledge as to how any of the HVAC systems worked, just what Northwest Controls told him. Finally, he specifically acknowledged that the only basis he had for his valuation of the module/panel was the replacement cost.

Donnie Walls, a WGL employee, was called as a witness. He performed the general maintenance at the building in question, including the HVAC system. It was his testimony

the controls for the HVAC system were located upstairs in a small room; the controls consisted of a keyboard, computer, and modules; the HVAC system could not operate without the modules; and he did not observe any of the HVAC controls missing before the fitness equipment was removed from the building, but afterward he discovered the computer, keyboard, monitor, and modules were gone.

Jim Hodges testified. He was employed by Commercial Fitness during the period of April to June 2015. He worked the job of extracting equipment from the building. He removed the computer from the closet upstairs; he simply unplugged it from the wall, along with the wiring, and picked it up together with the monitor, keyboard, and mouse, but he did not remove anything from a panel box. Commercial Fitness employees did not have a key to the building; they had to wait on a man to let them in the building every day before they could start loading; and the man stayed on-site at all times. He was knowledgeable about each and every item taken out of the building, and the only thing taken off a wall was a phone system.

Andy Lyons testified as a witness for Commercial Fitness. He was employed at Northwest Controls and Airetech Corporation, who did work at the building. His employer received a service request and upon arrival at the building, they found an "application-specific" controller wasn't there anymore. He explained that the controller does the communication for heating and cooling the building; that there is a difference between a panel and a module; that a panel is like a metal or plastic enclosure and a module would be something inside of it; that you could take the modules from one building and install them in another building with a different HVAC system if you knew what to do with

SLIP OPINION

it; that a module is basically a computer; that it is called an "application-specific" controller, but it's really a programmable computer; and that it could be relocated to another building. He explained that part of the cost of the work done was associated with software and programming; that the module is a blank slate when you start and it has to be set up and programmed; and that a license is associated with the module.

Conversion is a common-law tort action for the wrongful possession or disposition of another's property. *Hartness v. Nuckles*, 2015 Ark. 444, 475 S.W.3d 558. To establish liability for the tort of conversion, a plaintiff must prove the defendant wrongfully committed a distinct act of dominion over the property of another, which is a denial of or is inconsistent with the owner's rights. *Id*. Where the defendant exercises control over the goods in exclusion or defiance of the owner's rights, it is a conversion, whether it is for defendant's own use or another's use. *Id*.

The standard of review on appeal from a bench trial is whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Id*. Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Id*. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Crane v. Taliaferro*, 2009 Ark. App. 336, 308 S.W.3d 648.

For its first point of appeal, Commercial Fitness contends the trial court's finding that WGL proved its conversion claim by a preponderance of the evidence is clearly erroneous. It is undisputed that the objects at issue—the monitor, keyboard, and panel/module—were

owned by WGL.[1]  The question is whether the trial court's finding that WGL presented sufficient evidence to establish that Commercial Fitness improperly exercised dominion and control over that property was clearly erroneous.  We find no clear error.

Although Commercial Fitness presented evidence supporting its position, we are not convinced the trial court clearly erred in finding WGL had proved its conversion claim.  In support, we summarize the testimony already reported and recall other unrefuted testimony from the trial as follows.  Rhett Garner leased the building owned by WGL and located in Lowell, Arkansas, for his World Gym franchise.  The bankruptcy trustee, Bill Clark, testified that he took possession of the building and secured it when Garner filed for bankruptcy. He explained he was not aware of any break-ins or thefts after he took possession of the building.  The person who was hired to liquidate World Gym's equipment found a buyer in Commercial Fitness, and the order approving the sale was entered on April 24, 2015. Arrangements were made for Commercial Fitness to take possession of the equipment it bought from the bankruptcy estate during the period from the end of April through the first week in May 2015, and possession of the building was returned to WGL on May 6, 2015.

Mike Charlton, manager of WGL, testified that he entered the building on May 6 with his employee, Donnie Wall, and noticed that it was very hot and stuffy.  He instructed Wall to turn on the air conditioning, and when Wall attempted to do so, he reported that the computer and other equipment necessary to operate the HVAC units was missing and the system would not work without them.  He explained that a computer operates all the

---

[1] Commercial Fitness does not contest on appeal the judgment as related to the monitor or keyboard. The appeal is limited to the judgment related to the panel/module.

functions of the air-conditioning units; that the system included a desktop CPU, a flat-screen monitor, a keyboard, and a device that is referred to as a panel or module; that the panel/module is a control unit providing the interface between the computer and the HVAC units. He testified that he contacted Outlaw about the missing equipment.

Brandon Outlaw, who owns Commercial Fitness, explained he had an average of ten people at a time helping to remove the property; he instructed them to remove all fitness equipment, all office equipment, phone systems, computers, TVs, and all audiovisual equipment; and he was in California the last two days equipment was being removed from the building. When Charlton notified him of the missing equipment, he texted Charlton he was checking on it and then texted, "They have it there. Not sure who didn't listen and pulled it out." The only equipment that was returned to Charlton, however, was the desktop CPU. The keyboard, monitor, and panel/module were never returned.

At the conclusion of the hearing, the trial court ruled:

> I think that, in this matter, the circumstantial evidence is persuasive. The HVA system was operational prior to the defendant moving equipment out of the building, and was not operational afterwards. The defendant's text . . . makes reference to a PC computer and a monitor. And Mr. Hodges testified he packed up the computer with no reference to a mouse or keyboard or a monitor, but did have the correct CPU. It only stands to reason that either all of the computer parts would be taken or none of them would.

Our review of the evidence presented in this case does not leave us with a definite and firm conviction that the trial court made a mistake.

For its remaining two points of appeal, Commercial Fitness challenges the trial court's awards of damages for the module/panel and for lost rents. We agree these damages must be reversed and remanded.

9

Ordinarily, the proper measure of damages for conversion of property is the fair-market value of the property at the time and place of its conversion. *McQuillan v. Mercedes-Benz Credit Corp.*, 331 Ark. 242, 961 S.W.2d 729 (1998). The market value of the property is not, however, the only measure of the damages recoverable in an action for conversion; the circumstances of the case may require a different standard, including a measure of the expenses incurred as a result of the conversion. *Id.*

Here, the evidence presented by Charlton to prove WGL's damages for the conversion of the module/panel was an invoice from Northwest Controls for $6,597.38 and a check issued by WGL in payment of that invoice. In other words, WGL presented evidence of the replacement value of the module/panel, not its fair-market value at the time and place of its conversion. WGL acknowledges "market value" is ordinarily the proper measure of damages for the item converted but contends there was no market for the module/panel because it was "application specific." We do not find WGL's argument convincing because there was testimony that the module could be used in other buildings to control other HVAC systems. Fair-market value was the proper measure of damages. *See Midfirst Bank v. Sumpter*, 2016 Ark. App. 552, ___ S.W.3d ___.

The trial court also awarded $3,000 in damages for "lost rents" as consequential damages arising out of the conversion. Commercial Fitness challenges this award of damages as well. The only evidence presented in support of lost rents was a "Commercial Lease Letter of Intent," dated June 30, 2015, and introduced through the testimony of a commercial real estate agent who testified that her client was interested in leasing the space for that amount of money on a temporary basis to hold an event. She acknowledged there

was nothing binding about the letter; instead, it was a proposal or negotiating tool. Commercial Fitness's primary challenge to this evidence is based on its hearsay objection. We do not find that argument persuasive. However, Commercial Fitness also challenges the evidence as not providing a substantial basis for what it contends is actually being sought as lost profits. Regardless of whether the evidence was intended to prove lost rent, as found by the trial court, or lost profits, as argued by Commercial Fitness, we agree that the letter alone does not provide sufficient evidence to support this damage award. For example, the letter of intent was acknowledged as nonbinding, and there was no testimony concerning the "going rate" for similar facilities in the area.

Consequently, we conclude the trial court erred in setting $6,597.38 as damages for the module/panel because the award was based on the invoice for replacement of the equipment rather than on its fair-market value at the time of conversion. We also find error in the trial court's assessment of $3,000 in damages for lost rents based solely on a nonbinding letter of intent. We therefore reverse and remand the damages awards for the panel/module and for lost rents for the trial court to take further action in accordance with this decision. *See Jones v. John B. Dozier Land Trust*, 2017 Ark. App. 23, ____ S.W.3d ____; *JAG Consulting v. Eubanks*, 77 Ark. App. 232, 244, 72 S.W.3d 549, 557 (2002) (citations omitted) (quoting *St. Louis R.W. Co. v. Clemons*, 242 Ark. 707, 415 S.W.2d 332 (1967)) ("The general rule is to remand common law cases for new trial. Only exceptional reasons justify a dismissal. One of the exceptions is an affirmative showing that there can be no recovery. *Pennington v. Underwood*, 56 Ark. 53, 19 S.W. 108 (1892). There it was said that when a trial record discloses 'a simple failure of proof, justice would demand that we remand the cause

11

and allow plaintiff an opportunity to supply the defect.' We have held this procedure applicable even when no proof was offered on an issue, and where it was not impossible that the deficiency in proof could be supplied.")

Affirmed in part; reversed and remanded in part.

GRUBER, C.J., and KLAPPENBACH, J., agree.

*Dover Dixon Horne PLLC*, by:  *Carl F. "Trey" Cooper III*, for appellant.

*Stephen Lee Wood, P.A.*, by:  *Stephen Lee Wood*, for appellee.