Cite as 2022 Ark. App. 14

# ARKANSAS COURT OF APPEALS

DIVISIONS III & IV
**No.** CV-20-665

| | | |
|---|---|---|
| NICK ALLEN | | **Opinion Delivered:** January 12, 2022 |
| | APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CV-19-1165] |
| V. | | |
| DAVID SARGENT | | HONORABLE XOLLIE DUNCAN, JUDGE |
| | APPELLEE | |
| | | REVERSED |

## MIKE MURPHY, Judge

Nick Allen appeals the decision of the Benton County Circuit Court awarding damages to David Sargent after default judgement was entered on Sargent's breach-of-contract claims against Allen. On appeal, Allen argues that the circuit court erred in awarding damages for lost profits and conversion. We agree and reverse.

On May 15, 2019, David Sargent filed a pro se complaint against Nick Allen, Josh Allen, Roderick Allen, and Teresa Allen for breach of contract, farming materials supplied and labor expended, and conversion. The allegations stem from a failed farming venture between Sargent and the Allens. Sargent was a farmer experienced with selling produce to Walmart. The Allens owned some farmland and approached Sargent about helping them get a contract selling produce to Walmart. They reached a deal wherein Sargent would help them get the contract and the operation running in exchange for a third of the profits. To

that end, Sargent secured a $2 million contract with Walmart. In his complaint, Sargent alleged that the Allens never paid him his share.

Nick Allen was served on June 14, 2019, but Sargent did not timely perfect service on the others. Josh, Roderick, and Teresa were eventually dismissed pursuant to Arkansas Rule of Civil Procedure 4(i). Nick Allen did not answer until November 6, 2019. After retaining counsel, Sargent moved to strike Allen's answer and for entry of default judgment, which the court granted. The issue of damages was reserved for a future hearing. Allen never moved to set aside the default judgment, and a hearing on the damages issue was held on July 21, 2020. The circuit court announced its findings at the conclusion of the trial. Pertinent to this appeal, on the claim for breach of contract, the court awarded Sargent lost-profits damages of $72,773.33. It further awarded Sargent $19,000 for conversion of a green-bean harvester and $32,000 for conversion of a three-row planter. On appeal, Allen argues that the circuit court erred in awarding damages for lost profits and conversion. We reverse.

In Arkansas, a default judgment establishes liability but not the extent of damages. *Entertainer, Inc. v. Duffy*, 2012 Ark. 202, at 8, 407 S.W.3d 514, 520. A hearing is required to establish damages, and the plaintiff must introduce evidence to support damages. *Id.* A defaulted defendant may challenge on appeal the sufficiency of the evidence to support the amount of damages awarded. *Volunteer Transp., Inc. v. House*, 357 Ark. 95, 103, 162 S.W.3d 456, 460 (2004). Our standard of review following a bench trial is whether the circuit court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Summers Drilling & Blasting, Inc. v. Goodwin & Goodwin, Inc.*, 2021 Ark. App. 267, at 2, 626 S.W.3d 130, 131. A finding is clearly erroneous when, although there is evidence to support it, the

2

reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*

I. *Damages for Lost Profits*

The proof of lost profits must be shown by evidence that makes it "reasonably certain" what the plaintiff would have made. *Robertson v. Ceola*, 255 Ark. 703, 704, 501 S.W.2d 764, 766 (1973). The plaintiff must produce a reasonably complete set of figures and not leave the fact-finder to speculate as to whether there would have been any profits. *Id.* The proof must be sufficient to remove the question of profits from the realm of speculation and conjecture. *Id.*

On direct examination, Allen testified that he and his brother took distributions from their farming operation, All-Ag, LLC, in 2016 in the amount of $217,000. The court reasoned that

> [b]ecause if that's what they got, it should have been divided by three, not by two. I guess we need to subtract the five thousand . . . he received. So, 72,773.33 minus five. I believe that the -- while I believe [Allen], evidently, used his efforts on this farm to grow and sell more vegetables than he actually provided to Walmart, I think it would be speculation for me to try to determine the diversion of those efforts and the diversion of that money to another company. So, I don't think I can do that beyond this 72,000. I think that's a reasonably certain sum that Mr. Sargent should have been able to expect and I think that's on the conservative side.

The flaw in the court's reasoning, however, is that distributions made from an LLC are not the same thing as profits from a specific contract.

Allen testified that the LLC did not make any money off the Walmart contract, and in fact, it lost money. He explained that not all of All-Ag's business was to Walmart: the business sold produce to other entities, but overall, it lost money in 2016. Specifically, it lost money on the Walmart deal. And so, while the Allens did take distributions in 2016,

All-Ag's profit-and-loss statement for 2016 showed a loss of over the year. The tax return for the year, which was discussed but not admitted, also showed a loss.

At trial, Sargent explained that the Allens were supposed to provide the land and that they were in charge of the actual farming operation. He said they would share in the expense, but the Allens turned out to be poor farmers, they failed to grow sufficient produce to supply Walmart, and the produce that was grown was substandard. Sargent testified that the sales to Walmart were closer to $200,000.

Sargent also called Michael Augustine as a witness. Augustine was formerly a senior director of produce at Walmart. He testified that he visited the Allens' farm during the relevant time period and observed the fields to be "messy . . . [with] a lot of undergrowth and weed growth." Augustine further explained that a $2 million contract does not guarantee a grower $2 million. Actual demand, produce quality, waste, labor, weather, pests, and other factors all weigh on the profit margin a grower might see from a given contract.

Instead, the only evidence introduced on the issue of profits established that no profits were made. It was Sargent's responsibility to provide "a reasonably complete set of figures" from which the fact-finder could determine what Sargent would have made. Damages based on speculation and conjecture cannot be recovered for breach of contract. *Robertson*, *supra*. After review, we hold that the evidence here was not sufficient to establish proof of lost profits. Further, it was clear error for the court to use the distributions of the LLC as a measure, especially when the evidence showed that the LLC had ventures besides this one contract, lost money on this contract, and operated at a loss during the year in question.

## II. *Damages for Conversion*

Allen next argues that the circuit court erred when it awarded damages on Sargent's claims for conversion of a green-bean harvester and a three-row planter. Again, Allen was in default, so his liability for conversion is irrefutable. Still, as before, it was Sargent's duty to establish the damages, and Allen may challenge the sufficiency of the evidence supporting the amount of damages awarded.

Conversion is a common-law tort action for the wrongful possession or disposition of another's property. *Com. Fitness Concepts, L.L.C. v. WGL, LLC*, 2017 Ark. App. 148, at 7, 516 S.W.3d 764, 769. The proper measure of damages for the conversion of a personal item is its fair market value at the time and place of the conversion. *JAG Consulting v. Eubanks*, 77 Ark. App. 232, 238, 72 S.W.3d 549, 553 (2002). Evidence based on purchase, replacement, or rental prices is improper. *Id.* Fair market value is defined as the price the item would bring between a willing seller and a willing buyer in the open market after negotiations. *Id.*

In his complaint, Sargent alleged that the harvester "was on [the Allens'] property and in their care. It cost me $21,000." At trial, he explained that "it was just a shell and then I fabricated everything that I needed to make it whole and make it workable. And that's what I took up there to harvest the green beans with." When asked about the value of the harvester, Sargent said it was $19,000. "That's the value of the green bean harvester, after I got through with it."

Regarding the planter, Sargent alleged in the complaint that it cost $32,000. At trial, the following colloquy took place:

5

SARGENT:     The planter, uh, I had about $32,000.00 in it.

COUNSEL:     Was [that] new, used, where did you get it?

SARGENT:     I built it.

COUNSEL:     You built it?

SARGENT:     I had to buy the planting heads. You can only buy a single. I bought three of them and then I built everything else to connect them, as an individual – it has to operate as an individual unit. And, then bolt connections, the hydraulics and everything to the tractor.

The only evidence of the values of the harvester and the planter was through Sargent's testimony. He testified as to the harvester's worth once he "got through with it," but he did not say when it was built or provide any evidence of its fair market value in June 2016. Nor was there testimony on when the planter was built or its fair-market value in June 2016.

Sargent argues that because these were specifically fabricated and unique items designed for particular work, and given Sargent's testimony regarding his efforts in customizing the equipment, the circumstances of this case require a standard different than the market value.

Sargent cites *First National Bank of Brinkley v. Frey*, 282 Ark. 339, 668 S.W.2d 533 (1984), for the proposition that conversion damages are not limited to fair market value. In *Frey*, the supreme court wrote that "the market value of the property is not the only measure of the damages recoverable in conversion; the circumstances of the case may require a different standard, including expenses incurred." 282 Ark. at 342, 668 S.W.2d at 535. But that language from *Frey* was referring to an award of damages for expenses the plaintiff incurred *because* of the conversion.

6

Nor do we think that the farm equipment was so incredibly unique as to escape a fair market valuation. Regarding the green-bean harvester, Sargent's testimony established that he found the shell of a "big harvester" in Canada, and he "fabricated everything that [he] needed to make it whole and make it workable." He testified that it was worth $19,000 "after [he] got through with it." A bean-picking tractor can be assigned a value. The same reasoning applies to the planter. Sargent explained the planter was

> [a] three row planter—they had one row planters is what they had. And, they are very high tech. And, to me, you know, I get out there and I plant a hundred acres and I'm doing it a row at a time, [ ] it's going to take forever. So, I decided I would take three of these and put them together where I could plant three rows at a time instead of one.

In *Commercial Fitness Concepts*, 2017 Ark. App. 148, at 10, 516 S.W.3d at 771, the appellee contended that using a market-value standard to determine conversion damages of the converted HVAC module/panel was inappropriate because the HVAC equipment was "application specific." We wrote, however, that fair market value was the proper measure of damages "because there was testimony that the module could be used in other buildings to control other HVAC systems." *Id*. Certainly there are circumstances that could require a different standard in a conversion case; however, the facts here do not support such a departure. As in *Commercial Fitness Concepts*, the farm equipment could be used elsewhere for the same purpose. A fair market value could have been established. It was clear error to depart from the standard, and the award for damages on the converted property is unsupported.

Reversed.

GLADWIN, VAUGHT, and HIXSON, JJ., agree.

7

HARRISON, C.J., and VIRDEN, J., concur in part and dissent in part.

**BRANDON J. HARRISON, Chief Judge, concurring in part and dissenting in part**. I agree that $67,739.33 in damages must be reversed because the distributions made to the defendants from their business are not a reasonable measure of lost profits on a specific contract with a Walmart supplier. I respectfully dissent, however, from the decision to reverse the $51,000 in conversion damages awarded to David Sargent. First, every allegation in Sargent's complaint was admitted. Consequently, Allen wrongfully possessed Sargent's farm equipment as a matter law. Second, the circuit court did not err when it awarded Sargent damages.

Generally, the measure of damages for conversion is the price that the personal property is worth to a willing seller and buyer on the open market—not the purchase, rental, or replacement cost. *Ford Motor Credit Co. v. Herring*, 267 Ark. 201, 589 S.W.2d 584 (1979). But an exception to this general rule exists under Arkansas law. I would apply the exception.

Sargent showed that the Allen family owns hundreds of acres of prime farmland in Northwest Arkansas and that he (Sargent) had years of experience as a top produce supplier for Walmart. Together, Sargent and the Allen family formed a farming venture using the Allens' land and Sargent's produce expertise to grow green beans, squash, okra, cucumbers, and other vegetables. According to Sargent, Allen had "two great big, brand new John Deere tractors" and some "real fancy" equipment. But the "fancy" equipment would not work to grow produce because when "growing produce, everything has to be sized so that it will all fit on what you're doing." Sargent said that he supplied the vegetable harvester

8

to use on the farm. And he built the harvester to fit all the rows for various vegetables, which had to be in multiples of thirty inches. Sargent said:

> I designed—my dad used to tell me I was the laziest person to ever walk the face of the earth, because I always looked for an easy way to do something. Harvesting squash, you have to get out there and you pick it by hand and take it in buckets, and then you've got to carry it out of the field. And, I didn't have to do very much of that until I realized, you know, there's got to be a better way. So, I designed and fabricated a harvester. And, what it was, was a—started out with a two-wheel trailer and put a conveyor on it and that conveyor would stick out on each side, like this (demonstrating) and stick out there about ten feet. So, when it goes through the field, there's a person picking the produce off of each row. They put it on the conveyor that's up, going into a washing facility, and then the girls—we usually used girls on the trailers to do the washing—and they would put it in the containers, after it had been cleaned, and weigh it on the scales, and, then, palletize it on the pallet, on the trailer. So, we would just take a forklift, pick it up and we're done.
>
> . . . .
>
> And, uh, when I plant green beans, I said, you know, I need to find one of these one row harvesters. Well, now, they've got these big harvesters that are 30 foot wide harvesting green beans. And, I finally found a part of one in Canada and I bought it. And, it was just a shell and then I fabricated everything that I needed to make it whole and make it workable. And, that's what I took up there to harvest the green beans with. Because, you get out there and start harvesting green beans by hand and sell them to Walmart at Walmart prices, you will lose money. There's no way it can be done. Well, with a machine, that machine going down through there and it harvests the green beans, and cleans them, and they fall out in tubs, then you take those tubs out from under there, stick in another one and weigh it, adjust the volume—the weight on it and keep on trucking.

When asked about the value of the harvester, Sargent said it was worth $19,000. "That's the value of the green bean harvester, after I got through with it," he said.

As for the three-row plastic planter, Sargent said that he decided to take three one-row planters and put them together, so he could plant three rows at a time instead of one. He "bought three of the headers and then built the frames and everything for it." Sargent

9

testified that this special fabrication allowed him to plant fifteen feet at a time instead of five feet. When asked what the value of the three-row plastic planter was, Sargent replied, "The planter, uh, I had about $32,000 in it." When asked where he got the planter and if it was new or used, Sargent said, "I built it." He explained that he had to buy the three separate planting heads because they were only sold individually; then he built "everything else to connect them . . . [and] then [added] bolt connections, the hydraulics and everything to the tractor."

In *First National Bank of Brinkley v. Frey*, the supreme court wrote that the "market value of the property is not the only measure of the damages recoverable in conversion; *the circumstances of the case may require a different standard*[.]" 282 Ark. 339, 342, 668 S.W.2d 533, 535 (1984) (emphasis added). This court applied a standard different than fair market value in *Holland v. Walls*, 3 Ark. App. 20, 621 S.W.2d 496 (1981), when it relied on unjust-enrichment principles to grant a recovery for conversion. We reasoned that a conversion should not unjustly enrich either the plaintiff or the tortfeasor. Sister states have also applied an exception to fair market value as the measure of damages for conversion when equity and special circumstances so require. *E.g.*, *Bernhardt v. Ingham Reg'l Med. Ctr.*, 641 N.W.2d 868, 871 (Mich. Ct. App. 2002) ("When property does not have a market value, *the property's value to the owner*, so far as it is susceptible of pecuniary measurement which is not fanciful or merely speculative, furnishes the true test of damages.") (emphasis added); *see also* Restatement (Second) of Torts § 911 cmt. e, § 927 cmt. c (1977).

Here, the circuit court heard the witnesses, assessed their credibility, and made a factual finding that "those items [the planter and the harvester] were specifically fabricated,

10

unique items that were designed for this particular work." The court plowed no new ground by so ruling. Nor did it clearly err. Sargent's testimony gave the circuit court a basis for measuring his loss with reasonable certainty—and that is what the law of damages primarily requires.

No one contested that the equipment Sargent developed and fabricated to plant and harvest vegetables in thirty-inch rows on small farms in rural Arkansas was unavailable on the open market. Sargent could not have bought what he needed to economically harvest the produce that was grown along thirty-inch rows. That is why he ordered a significant part for a machine from Canada and built the harvester himself. And he figured out how to construct a planter, which included fabricating hydraulics, so he could plant fifteen feet at a time to increase efficiency and profitability. Again, the "fancy" equipment Allen had on his farm did not work for growing produce. No one rebutted this testimony. That the equipment Sargent constructed was used in the fields proves its practical worth to the farming tasks at hand. It is also worth mentioning that Allen never tried to rebut Sargent's valuations. Simply put: Sargent's unrebutted damages testimony was accepted by the circuit court, and we should affirm its award.

★ ★ ★

Article 2, section 13 of the Arkansas Constitution requires that a remedy be made available for every wrong.[1] The majority's opinion has transgressed this core principle

---

[1]"Every person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character; he ought to obtain justice freely, and without purchase; completely, and without denial; promptly and without delay; conformably to the laws." Ark. Const. art. 2, § 13.

because there is admitted fault on a conversion claim, and we know (well enough) the farm equipment's value when Allen converted it, but no remedy is forthcoming to Sargent. Not only does the majority's decision violate a core principle of tort law—that every civil wrong receive a remedy—it also stifles human ingenuity and creative problem solving.

I respectfully concur in part and dissent in part.

VIRDEN, J., joins.

*Lax, Vaughan, Fortson, Rowe & Threet, P.A.*, by: *Grant E. Fortson*, for appellant.

*The Story Law Firm, PLLC*, by: *Travis W. Story* and *Gregory F. Payne*, for appellee.